IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

------------------------------------------------------   :
UNITED STATES OF AMERICA,               :  CASE NO.  5:10 CR 304
                                                                   :
                                           Plaintiff,     :
                                                                   :
            -vs-                                         :  MEMORANDUM OF OPINION AND
                                                                   :  ORDER GRANTING DEFENDANT'S
                                                                   :  MOTION TO SUPPRESS
DEJUAN McCRANEY,                            :
                                                                   :
                                        Defendant.     :
------------------------------------------------------   :

UNITED STATES DISTRICT JUDGE LESLEY WELLS

  Defendant Dejuan McCraney ("Mr. McCraney") moves to suppress a handgun and ammunition found under the driver's side seat of his vehicle during a traffic stop and search, and to suppress statements made regarding the handgun to his probation officer.  (Doc. 14).  The Government has responded in opposition.  (Doc. 17).  Mr. McCraney has filed a brief in reply.  (Doc. 18).

  An evidentiary hearing was held on 10 February 2011, with counsel and Defendant present.  The Court heard testimony from Massillon Police officer Curtiss Ricker ("Officer Ricker") for the Government, and from Mr. McCraney and Mr. McCraney's aunt, May Weems ("Ms. Weems") for the Defendant, regarding their assessments of the events surrounding the traffic stop and search of Mr. McCraney's Buick in the early morning hours of 4 July 2010. That search yielded a loaded

44 magnum Ruger Super Redhawk revolver from under the Buick's driver's seat. (Government's Exhibit 4)  (Suppression Hearing Transcript ("TR"), pp. 1-158).[1]

Based upon the evidence adduced at the hearing, the briefs before the Court, and the relevant law, this Court will grant the Defendant's motion to suppress.

## I.  FACTUAL BACKGROUND

The Court has gleaned the following facts from the evidence submitted. According to the police report, Massillon Police Officer Curtiss Ricker was on routine patrol in a marked squad car traveling west on Lincoln Way in Massillon at 12:50 a.m. on 4 July 2010, when the Defendant's Buick Riviera, heading east on Lincoln Way, passed Officer Ricker's cruiser with its high beams on.  (Doc. 17, Exhibit 1, Police Report; TR 15).  Officer Ricker turned and followed the Buick, observing that the car again failed to dim its headlights for another oncoming car.  As he pulled closer to read the temporary tags Officer Ricker testified he witnessed "both driver and occupant leaning over, leaning down towards the floor of the vehicle and movement along with that as far as shoulders, arm."  TR 15-16.  In his testimony, Mr. McCraney disputed that he or the driver, Rudolph Ammons ("Mr. Ammons"), made any such movements or gestures at any time during the course of the incident.  TR 136-37, 148.

The Officer testified that the Buick then slowed to a stop on the curb lane and opened its window.  TR 18.  Officer Ricker slowly passed the Buick and witnessed the driver, Mr. Ammons, gesturing out the window to flag down the squad car.  Id.  Officer

---

[1]Pagination of the rough transcript moves sequentially until it leaps from page 57 to page 110.

2

Ricker testified that he then drove his squad car a few blocks and into the empty parking lot of the Massillon Moose Lodge.  TR 18-20; Govt's Ex. 3.  It is uncontroverted that Officer Ricker did not gesture them into the parking lot, but that Mr. Ammons and Mr. McCraney followed the squad car in the Buick.  TR 39-40.  Officer Ricker testified that he did not stop the Buick when he was behind the vehicle for reasons of officer safety but admitted that he could have stopped the vehicle and called for support while waiting in the squad car.  TR 39.  Further, Officer Ricker testified that from the moment he encountered the Buick with its high-beams on he was going to make a traffic stop.  TR 43.

When Mr. Ammons brought the Buick to a stop in the parking lot, Officer Ricker recounted that he then swung his squad car around and brought it to rest facing the front of the Buick about a car's length apart.  Officer Ricker testified that his maneuver did not block the Buick from leaving, while Mr. McCraney testified that Officer Ricker's maneuver created a situation where he did not feel free to leave.  TR 23, 149.  With the squad car's spot-light trained on the passenger compartment of the Buick, Officer Ricker testified that he then approached the vehicle and commanded the two passengers place their hands in view.  TR. 20-24.  Mr. Ammons and Mr. McCraney complied with the Officer's commands.  Officer Ricker further testified that the two individuals were compliant with his orders during the course of the incident.  TR 110.

Officer Ricker testified that he approached the driver, Mr. Ammons, and asked for his driver's license, registration and insurance.  Mr. Ammons produced an Ohio I.D. and, explaining they were lost, asked Officer Ricker for directions to Interstate 77.  TR 26.  This conversation occurred while Officer Ricker was receiving Mr. Ammon's

information.  At some point during this initial encounter, Officer Ricker noted that Mr. McCraney stepped out of the car as if to ask the Officer a question.  TR 27.  Mr. McCraney related that he was trying to provide the Officer with the car's documentation, which was on his person.  TR 152-53.  Officer Ricker ordered Mr. McCraney back into the car and the Defendant complied.

Officer Ricker returned to his squad car, called for back-up, and ran Mr. Ammons card through the police data base.  TR 27.  Through dispatch, Officer Ricker learned that Mr. Ammons' license had been suspended.

Officer Michael Maier then arrived, parking behind and to the side of the Buick.  Officer Ricker testified that he asked Officer Maier to run to car's registration.  Officer Ricker testified, on direct examination, that Mr. Ammons and Mr. McCraney were free to leave even after Officer Maier parked behind the Buick.  TR 30.   However, on cross-examination Officer Ricker testified that he considered the traffic-stop initiated, and the occupants were not free to leave, at the point in time when he asked for Mr. Ammons' identification, prior to Officer Maier's arrival.  TR 46.

 In the submitted police report, Officer Maier "observed movements in the passenger compartment by both individuals, upon his arrival, that indicated they were concealing something under the seat(s)."  Mr. McCraney disputes that he or Mr. Ammons made any such gestures or movements.  TR 148.

Officer Maier's inquiry found the Buick registered to Mr. McCraney, whose driver's license was also suspended.  TR 28.  However, prior to finding that Mr. McCraney's license was suspended, Officer Ricker discussed with Mr. Ammons the situation of his suspended license; the Officer also discussed their location vis-a-vis

4

Interstate 77, explaining that he could not lead them to the highway because it was outside of his jurisdiction. TR 31.

Finding that both Mr. Ammons and Mr. McCraney had suspended licenses, Officer Ricker testified that he determined at that point to arrest the two and have the car towed. TR 32, 51. Yet, Officer Ricker also testified that he allowed Mr. McCraney to call his aunt to come and pick up her nephew, Mr. Ammons, and the vehicle. TR 52. Officer Ricker explained, under cross-examination, that he allowed Mr. McCraney to call his aunt to come and pick them up before he learned of the Defendant's suspended license. TR 53. The pertinent testimony went as follows:

> Q. At what point, then, do you change your mind and decide to impound the vehicle?
>
> A. When Officer Maier advices [sic] me Mr. McCraney did not have a driver's license as well.
>
> Q. But he was allowed to call to have his aunt come and pick him up; that call took place after patrolman Maier found out he didn't have a driver's license, correct?
>
> A. No.
>
> Q. Well then why would he even have to make the call [sic] officer to have his aunt come down if at the time we're talking about you don't know that he has an invalid license?
>
> A. At that time I did not know that he did not have a driver's license.
>
> Q. Then why wouldn't he [be] allowed to drive, drive away?
>
> A. He actually moved over to the driver's seat and was going to drive away.
>
> Q. Okay. Isn't it a fact that it was after you found out that he did not have a driver's license that he was granted the privilege to call his aunt to come pick him, his friend, and the car up?

5

A. Yes.

TR 53-54.

Further, Officer Ricker testified that even after he observed Ammons' and McCraney's movements and gestures in the Buick, prior to pulling into the Moose Lodge parking lot, he was ready to allow Mr. McCraney to drive the Buick away:

> Q. Isn't it a fact that at one point DeJuan McCraney showed you his driver's license, the registration, as well as proof of insurance and was going to be allowed to drive off until patrolman Maier told you that his driver's license was under suspension?
>
> A. I do recall seeing the proof of insurance. I do not recall seeing the other documents.
>
> Q. But he was going to be allowed to drive away at one point until Maier came back and said he had the [suspension] on his driver's license as well, correct?
>
> A. He slid over to the driver's seat and was preparing to drive and Officer Maier advised me he was under suspension.
>
> Q. And if he had not advised you [ ] of that he would have been free to drive away, is that correct?
>
> A. Yes.

TR 118. Mr. McCraney testified that he had actually turned on the Buick's ignition and, when his license was returned as suspended, Officer Ricker had him turn the car off. TR 148.

Officer Ricker further testified that he determined, as a result of the "movement and gestures" in the car when he was initially behind the Buick on the public thoroughfare, that he was going to search the vehicle. TR 113-14. Officer Ricker testified that the gestures of Ammons and McCraney provided his basis for believing that criminal activity was afoot in the vehicle, and therefore allowed him to search the vehicle. Id.

6

Finally, Officer Ricker testified that his decision to allow Mr. McCraney to telephone his aunt was merely a ruse to diffuse the situation. TR 128-29. Officer Ricker testified that he would not have allowed Mr. McCraney to leave, but that he did not want to alarm the two men and escalate the situation by arresting them. Id. At that point in time at least Officer Ricker and Officer Maier were at the scene. All parties agree that five officers were present at the scene when Mr. McCraney and Mr. Ammons were asked to exit the vehicle. Mr. McCraney's uncontested testimony is that a minute after making the three-minute phone call to his aunt he was asked to exit the vehicle. TR 140, 143, 144.

With five police officers and four squad cars on the scene, Officer Ricker testified he ordered Mr. Ammons and Mr. McCraney out of the Buick. TR 32-33, 54. Both Mr. Ammons and Mr. McCraney were removed from the vehicle and patted down. Nothing illicit was found on their persons. The Defendant and Mr. Ammons were then, according to Officer Ricker, ordered to stand at the rear of the Buick with three officers ranged around them. TR 33-34, 55. Neither Mr. Ammons nor Mr. McCraney were placed under arrest or in handcuffs. Officers Smith and Maier then searched the Buick. TR 34. When Officer Smith found a loaded revolver under the driver's side seat of the vehicle both Mr. Ammons and Mr. McCraney were handcuffed, placed under arrest, and put into the back seat of a patrol car. TR 35-36; Exhibit 4.

Ms. Weems testified that by the time she arrived with her son from Canton to drive the Buick, Mr. Ammons and Mr. McCraney back home, the parties were gone. TR 157-58.

Following Mr. McCraney's arrest and incarceration he was interrogated by his Parole Officer, Ms. Sandra Woolf. (Doc. 14). Defendant made an oral statement to her regarding the firearm. Later, on 13 July 2010, while at the Stark County Jail, Defendant gave a written statement regarding the firearm to ATF agents Hopkins and Guerra.

## II. LAW AND ANALYSIS

The Fourth Amendment states, "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated,...." U.S. Const. amend. IV. This protection extends to the unreasonable seizure of persons, California v. Hodari D., 499 U.S. 621, 624 (1991), and "belongs as much to the citizen on the streets of our cities as to the homeowner closeted in his study to dispose of his secret affairs," Terry v. Ohio, 392 U.S. 1, 8-9 (1968). Of course, the Fourth Amendment does not prohibit all seizures, only those that are unreasonable. Id. at 9.

The question of whether an officer has reasonable grounds to "stop" and "frisk" falls directly within the Fourth Amendment's proscription against unreasonable searches and seizures. Terry v. Ohio, 392 U.S. 1, 16 (1968). Police officers are permitted to conduct stops based on reasonable suspicion that criminal activity is afoot and to frisk the detained citizen if they have a reasonable belief the person is armed. Terry, 392 U.S. at 30.

Fourth Amendment rights are personal rights and may not be asserted vicariously. See United States v. Myers, 102 F.3d 227, 231 (6th Cir. 1996). The Fourth Amendment protects interests that include the "freedom of movement and insulation

8

from the fear and anxiety produced by unlawful seizure.  In the traffic stop scenario, these interests are personal to all occupants of the vehicle that is detained." United States v. Richardson, 385 F.3d 625, 629 (6th Cir. 2004).

A passenger traveling in a stopped vehicle has standing to challenge the legitimacy of the stop, as a seizure of his or her person, yet lacks standing to challenge the search of a vehicle belonging to another or any items found on other passengers, or driver.  See United States v. Carter, 14 F.3d 1155; United States v. Decker, 19 F.3d 287, 288 (6th Cir. 1994).

Pursuant to Terry v. Ohio, 392 U.S. 1 (1968), the police may carry out an investigative stop based upon reasonable suspicion the individual is engaged in criminal activity.  Courts have enunciated the posture of that power to perform an investigative stop as "brief" to determine "identity or to maintain the status quo momentarily while obtaining more information." Adams v. Williams, 407 U.S. 143, 145-46 (1972).  Courts have recognized that officers "may ask the detainee a moderate number of questions to determine his [or her] identity and to try to obtain information confirming or dispelling the officer's suspicions." Berkemer v. McCarty, 468 U.S. 420, 439 (1984).

The Court expounded on Terry in United States v. Cortez, 449 U.S. 411, 417-418 (1981), stating,

> [a]n investigatory stop must be justified by some objective manifestation
> that the person stopped is, or is about to be, engaged in criminal activity ...
> the totality of the circumstances--the whole picture--must be taken into
> account. Based upon that whole picture the detaining officers must have a
> particularized and objective basis for suspecting the particular person
> stopped of criminal activity.

Courts have long held that a law enforcement officer lacking probable cause sufficient to justify an arrest may briefly detain an individual for investigative purposes without violating the Fourth Amendment if the officer possesses a "reasonable suspicion that [the defendant] was engaged in wrongdoing when [the officer] encountered him [or her]." U.S. v. Sokolow, 490 U.S. 1, 7 (1989). See also United States v. Lopez-Arias, 344 F.3d 623, 627 (6th Cir. 2003) (holding that "courts have recognized that a law enforcement officer who lacks probable cause to justify an arrest may nevertheless briefly detain an individual without violating the Fourth Amendment if the officer possesses a reasonable and articulable suspicion that the individual has committed a crime"). A finding of reasonable suspicion may "arise from information that is less reliable than that required to show probable cause." Alabama v. White, 496 U.S. 325, 330 (1990).

In the instant case, it is clear that Officer Ricker had probable cause to effect a traffic stop, at whatever point in the sequence of events that stop was actually affected. As this Circuit noted in United States v. Ferguson, 8 F.3d 385, 391 (6th Cir. 1993) (en banc):

> We focus not on whether a reasonable officer "would" have stopped the suspect (even though he had probable cause to believe that a traffic violation had occurred), or whether any officer "could" have stopped the suspect (because a traffic violation had in fact occurred), but on whether this particular officer in fact had probable cause to believe that a traffic offense had occurred, regardless of whether this was the only basis or merely one basis for the stop.

Officer Ricker's observation of the improper use of high-beams provided the necessary probable cause to stop and inquire, regardless of whether the "stop" was, at first, consensual.

The uncontroverted testimony of Officer Ricker, further, provides clear evidence that he did not possess either probable cause or reasonable suspicion to search the Defendant's vehicle. Nothing in Officer Ricker's recounting of the events that evening provide the basis for the Court to find that the Buick could reasonably be searched, as either incident to an arrest which occurred after the vehicle was searched, or as an inventory search when an arrest had not occurred, or as a precautionary search for officer safety when the two individuals were outside of the vehicle and surrounded by three of five officers.

Instead, Officer Ricker's uncontested testimony paints a rather different picture. Officer Ricker admits that even after he viewed suspicious movement in the Buick, prior to entering the Moose Lodge parking lot, and even after Officer Maier viewed suspicious movement in the vehicle, Mr. McCraney was allowed to assume the driver's seat, turn on the Buick, and prepare to leave. Further, even after both men's driving privileges were reported back to the Officers as suspended, Officer Ricker allowed Mr. McCraney to call his aunt to come and drive the men and the Buick away. These are not the actions of an officer in possession of reasonable suspicion to affect an arrest and exercise a search of a vehicle.

Officer Ricker's explanation for allowing Mr. McCraney to telephone his aunt – to prevent the situation from escalating – simply does not comport with the totality of the testimony. First, there is no indication from Officer Ricker's testimony that this "stop" was anything but consensual from the beginning. Second, Officer Ricker testified he was willing to let Mr. McCraney drive the Buick away from the scene only a moment before allowing the Defendant to place the telephone call to Ms. Weems. Third, by all

11

accounts, Officer Ricker was not the only officer at the scene and, while waiting for Ms. Weems arrival, there were as many as five officers in attendance. Finally, any foundation that would allow for a 'ripening' of the stop, from an inquiry to an arrest and search of the vehicle occurred, according to Officer Ricker's testimony, prior to his decision to allow Mr. McCraney to, first, drive the Buick himself, and then, second, to allow Mr. McCraney to place a call to his aunt.

Accordingly, viewing the testimony, the parties' briefs, and the law, the Court does not find a basis to support a search of the Defendant's vehicle. The loaded handgun and Mr. McCraney's subsequent comments regarding the handgun will be suppressed.

### **III. CONCLUSION**

For the reasons discussed above, Mr. McCraney's motion to suppress is granted.

IT IS SO ORDERED.

                                                    /s/Lesley Wells  
                                      UNITED STATES DISTRICT JUDGE

Date: 22 April 2011